1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                  FOR THE EASTERN DISTRICT OF CALIFORNIA

10    RUBY J. GILLIAM FAKOURY,

11              Plaintiff,                    No. CIV S-07-2630 FCD GGH

12        vs.

13
      MICHAEL J. ASTRUE,                      FINDINGS AND RECOMMENDATIONS
14    Commissioner of
      Social Security,

15
              Defendant.

16    _____/

17              Plaintiff seeks judicial review of a final decision of the Commissioner of Social

18    Security ("Commissioner") denying her applications for Disability Insurance Benefits ("DIB")

19    and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act

20    ("Act").  For the reasons that follow, the court recommends that plaintiff's Motion for Summary

21    Judgment be denied, the Commissioner's Cross Motion for Summary Judgment be granted, and

22    the Clerk be directed to enter judgment for the Commissioner.

23    BACKGROUND

24              Plaintiff, born October 17, 1952, applied on December 19, 2003 for disability

25    benefits.  (Tr. at 87, 432.)  Plaintiff alleged she was unable to work due to back and neck pain,

26    headaches, swollen knees, problems with balance, depression, and anxiety.  (Tr. at 451.)

1

1        In a decision dated April 26, 2006, ALJ William C. Thompson, Jr. determined

2    plaintiff was not disabled.  The ALJ made the following findings:[1]

3        1.    The claimant met the disability insured status requirements
              of the Act on May 28, 2003, and continued to meet them
4              through March 31, 2006.

5        2.    The claimant has not performed substantial gainful activity
              since May 28, 2003.
6
        3.    The medical evidence establishes claimant has severe
7              arthritis and depression, but that she does not have an
              impairment, or combination of impairments, listed in or
8              equivalent in medical severity to one listed in, Appendix 1,
              Subpart P, Regulations No. 4.
9
        4.    The allegations of the claimant and her family members are
10             not credible.

11   \\\\\

12   _____

        [1]  Disability Insurance Benefits are paid to disabled persons who have contributed to the
13   Social Security program, 42 U.S.C. § 401 et seq.  Supplemental Security Income is paid to
     disabled persons with low income. 42 U.S.C. § 1382 et seq.  Both provisions define disability, in
14   part, as an "inability to engage in any substantial gainful activity" due to "a medically
     determinable physical or mental impairment. . . ."  42 U.S.C. §§ 423(d)(1)(a) & 1382c(a)(3)(A).
15   A parallel five-step sequential evaluation governs eligibility for benefits under both programs.
     See 20 C.F.R. §§ 404.1520, 404.1571-76, 416.920 & 416.971-76; Bowen v. Yuckert, 482 U.S.
16   137, 140-142, 107 S. Ct. 2287 (1987).  The following summarizes the sequential evaluation:
            Step one:  Is the claimant engaging in substantial gainful
17   activity?  If so, the claimant is found not disabled.  If not, proceed
     to step two.
18          Step two:  Does the claimant have a "severe" impairment?
     If so, proceed to step three.  If not, then a finding of not disabled is
19   appropriate.
            Step three:  Does the claimant's impairment or combination
20   of impairments meet or equal an impairment listed in 20 C.F.R., Pt.
     404, Subpt. P, App.1?  If so, the claimant is automatically
21   determined disabled.  If not, proceed to step four.
            Step four:  Is the claimant capable of performing his past
22   work?  If so, the claimant is not disabled.  If not, proceed to step
     five.
23          Step five:  Does the claimant have the residual functional
     capacity to perform any other work?  If so, the claimant is not
24   disabled.  If not, the claimant is disabled.
     Lester v. Chater, 81 F.3d 821, 828 n.5 (9th Cir. 1995).
25       The claimant bears the burden of proof in the first four steps of the sequential evaluation
     process.  Bowen, 482 U.S. at 146 n.5, 107 S. Ct. at 2294 n.5.  The Commissioner bears the
26   burden if the sequential evaluation process proceeds to step five.  Id.

                                    2

5.      The claimant has the residual functional capacity to perform the physical exertion and nonexertional requirements of work, except: she can lift and carry up to fifty pounds occasionally and twenty-five pounds frequently; she can stand/walk up to six hours in a workday; she cannot climb ladders or scaffolds; she must avoid heights and dangerous moving machinery; she can perform only unskilled work (20 CFR § 404.1545 and 416.945).

6.      The claimant is unable to perform her past relevant work.

7.      The claimant's residual functional capacity for the full range of medium work is reduced by the following limitations: she cannot climb ladders or scaffolds; she must avoid heights and dangerous moving machinery; she can perform only unskilled work.

8.      The claimant is 53 years old, which is defined in the regulations as "approaching advanced age" (20 CFR 404.1563. and 416.963).

9.      The claimant has a 12th grade education (20 CFR 404.1564 and 416.964).

10.     Transferability of acquired work skills is not material to this decision.

11.     If the claimant had the residual functional capacity to perform the full range of medium work, given her age, education, and work experience, section 404.1569 of Regulations No. 4 and section 416.969 of Regulations No. 16, and Rules 203.22 and 203.23, Table no. 3, Appendix 2, Subpart P, Regulations No. 4, would direct a finding that the claimant is not disabled.

12.     Although the claimant's additional nonexertional limitations do not allow her to perform the full range of medium work, using the above cited rule(s) as a framework for decisionmaking, there are a significant number of jobs in the national economy that she could perform.  Examples of such jobs are: driver helper, with 10,000 jobs in California; auto detailer; with 17,000 jobs in California; sewing machine operator, with 57,000 jobs in California: and small parts assembler, with 68,000 jobs.

13.     The claimant has not been under a "disability," as defined in the Social Security Act, at any time from May 28, 2003 through the date of this decision (20 CFR 404.1520(g) and 416.920(g)).

1 (Tr. at 31-32.)[2]

2 ISSUES PRESENTED

3      Plaintiff has raised the following issues: A.  Whether the ALJ Failed to Include

4 Appropriate Mental Limitations in the RFC; B. Whether the ALJ Erred in Relying on the VE's

5 Testimony About the Number of Jobs Available to the Claimant; C.  Whether the ALJ Erred in

6 Relying on the VE's Testimony that Significant Jobs Exist in the Local Economy that the

7 Claimant Can Perform; and D.  Whether the ALJ Erred in Failing to Grant Plaintiff's Request for

8 a Supplemental Hearing for Exhibit 23F.

9 LEGAL STANDARDS

10      The court reviews the Commissioner's decision to determine whether (1) it is

11 based on proper legal standards pursuant to 42 U.S.C. § 405(g), and (2) substantial evidence in

12 the record as a whole supports it.  Tackett v. Apfel, 180 F.3d 1094, 1097 (9th Cir.1999).

13 Substantial evidence is more than a mere scintilla, but less than a preponderance.  Connett v.

14 Barnhart, 340 F.3d 871, 873 (9th Cir. 2003) (citation omitted).  It means "such relevant evidence

15 as a reasonable mind might accept as adequate to support a conclusion."  Orn v. Astrue, 495 F.3d

16 625, 630 (9th Cir. 2007), quoting Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).  "The ALJ

17 is responsible for determining credibility, resolving conflicts in medical testimony, and resolving

18 ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th Cir. 2001) (citations omitted).

19 "The court will uphold the ALJ's conclusion when the evidence is susceptible to more than one

20 rational interpretation."  Tommasetti v. Astrue, 533 F.3d 1035, 1038 (9th Cir. 2008).

21 ANALYSIS

22   A.  The ALJ Properly Weighed the Medical Source Statements and the RFC Correctly

23 Reflected Plaintiff's Mental Limitations

24      Plaintiff asserts that the ALJ improperly weighed the mental health assessments in

25

26      [2]  Plaintiff had previously received disability benefits which ceased on May 28, 2003 as a result of a continuing disability review.  Plaintiff did not appeal from that decision.

the record, and thereafter failed to include her non-exertional mental limitations in her residual functional capacity.

The weight given to medical opinions depends in part on whether they are proffered by treating, examining, or non-examining professionals.  Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995).[3]  Ordinarily, more weight is given to the opinion of a treating professional, who has a greater opportunity to know and observe the patient as an individual.  Id.; Smolen v. Chater, 80 F.3d 1273, 1285 (9th Cir. 1996).

To evaluate whether an ALJ properly rejected a medical opinion, in addition to considering its source, the court considers whether (1) contradictory opinions are in the record; and (2) clinical findings support the opinions.  An ALJ may reject an *uncontradicted* opinion of a treating or examining medical professional only for *"clear and convincing"* reasons.  Lester , 81 F.3d at 831.  In contrast, a *contradicted* opinion of a treating or examining professional may be rejected for *"specific and legitimate"* reasons.  Lester, 81 F.3d at 830.  While a treating professional's opinion generally is accorded superior weight, if it is contradicted by a supported examining professional's opinion (supported by different independent clinical findings), the ALJ may resolve the conflict.  Andrews v. Shalala, 53 F.3d 1035, 1041 (9th Cir. 1995) (citing Magallanes v. Bowen, 881 F.2d 747, 751 (9th Cir. 1989)).  The regulations require the ALJ to weigh the contradicted treating physician opinion, Edlund v. Massanari, 253 F.3d 1152 (9th Cir.

\\\\\

\\\\\

---

[3]  The regulations differentiate between opinions from "acceptable medical sources" and "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed psychologists are considered "acceptable medical sources," and social workers are considered "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific regulations exist  for weighing opinions from "other sources."  Opinions from "other sources" accordingly are given less weight than opinions from "acceptable medical sources."

1  2001),[4] except that the ALJ in any event need not give it any weight if it is conclusory and

2  supported by minimal clinical findings.  Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir.1999)

3  (treating physician's conclusory, minimally supported opinion rejected); see also Magallanes,

4  881 F.2d at 751.  The opinion of a non-examining professional, without other evidence, is

5  insufficient to reject the opinion of a treating or examining professional.  Lester, 81 F.3d at 831.

6        The ALJ found plaintiff limited to unskilled medium work, with an inability to

7  climb ladders or scaffolds and preclusion from heights and dangerous moving machinery.  (Tr. at

8  31.)  Plaintiff's contention is twofold.  First, she claims that there is no explanation in the

9  findings for the limitation to unskilled work, and the ALJ failed to include other mental

10  limitations found by treating sources.  She also claims that the ALJ failed to explain the weight

11  given to these sources, other than Dr. Kalman, whose report he gave little weight.  In particular,

12  plaintiff claims that the ALJ appeared to have given no weight to Dr. Young, plaintiff's treating

13  psychiatrist, and although he gave weight to Dr. Sutter's and Mr. Allen's opinions that plaintiff

14  was malingering, he ignored their mental limitations.  Plaintiff also objects to the ALJ's failure to

15  weigh the opinions of most other sources.

16        The overarching problem in this case results from the numerous findings of

17  malingering by various practitioners who examined plaintiff.  In all, at least five practitioners

18  specifically diagnosed plaintiff with malingering: Dr. Harrison (id. at 324), Dr. Mateus (id. at

19  218), Dr. Richwerger (id. at 197), Dr. Sutter (id. at 305)[5], Mr. Allen (id. at 271 - rule out

20  malingering), and Dr. Young (id. at 280.)  Due to plaintiff's outright malingering, these

21  \\\\\

22

23     [4]  The factors include: (1) length of the treatment relationship; (2) frequency of

24  examination; (3) nature and extent of the treatment relationship; (4) supportability of diagnosis; (5) consistency; (6) specialization. 20 C.F.R. § 404.1527

25     [5]  The diagnosis for Axis I was actually "malingering versus psychotic disorder not

26  otherwise specified," but Dr. Sutter favored malingering due to extreme inconsistencies in presentation.  (Id.)

examining sources could not provide an accurate assessment of her functional abilities.[6]

Although the ALJ has the burden at step five of the sequential analysis, he should not be

hamstrung by plaintiff's malingering and purposefully hampering an accurate diagnosis or

residual functional capacity assessment during an exam.  Certain inferences may be drawn based

on the malingering, and the Social Security rules are not so perverse as to permit plaintiff to

benefit from her own malingering.

                In regard to plaintiff's first contention,

> Unskilled work is work which needs little or no judgment to do
> simple duties that can be learned on the job in a short period of
> time. The job may or may not require considerable strength. For
> example, we consider jobs unskilled if the primary work duties are
> handling, feeding and offbearing (that is, placing or removing
> materials from machines which are automatic or operated by
> others), or machine tending, and a person can usually learn to do
> the job in 30 days, and little specific vocational preparation and
> judgment are needed. A person does not gain work skills by doing
> unskilled jobs.

20 C.F.R. § 416.968(a).

                Unskilled jobs ordinarily involve dealing primarily with objects, rather than with

data or people, and involve little or no judgment to perform simple duties that can be learned on

the job in a short period of time.  SSR 85-15.

                The basis for the ALJ's finding that plaintiff could only do unskilled work most

likely derives from Dr. Sutter's July 26, 2004 evaluation in which he found that plaintiff would

have only a mild impairment in performing detailed and complex tasks, moderate impairment in

maintaining regular attendance due to post traumatic stress disorder,[7] and that the finding of

---

[6]  It should additionally be noted that the ALJ found plaintiff to be not credible and
plaintiff has not disputed this finding.  (Tr. at 22.)

[7]  This diagnosis is related to a car accident in 1996 wherein plaintiff claimed she hit a
telephone pole.  She heard the police arrive and state, "this nigger is dead," and then laugh at her.
She has flashbacks where the police are laughing at her.  She also stated that the police came to
her house and put a gun to her head.  (Id. at 302.)

1   malingering complicates this case.  He stated that plaintiff gave a very poor effort and the

2   malingering is based on the fact that she acted immature at times while at other times she was

3   very clear when she talked, and at other times she did bizarre things. (Id. at 306-07.)

4          The most recent psychiatric review technique form, dated August 11, 2004, found

5   that plaintiff was mildly limited in activities of daily living, maintaining social functioning, and

6   maintaining concentration, persistence, or pace.  (Tr. at 318.)  The DDS reviewer referred the

7   reader to the DEA investigation summary and noted that plaintiff was not credible, and that

8   "when investigation considered, PRT less restrictive than MSS."  (Id. at 320.)

9          A psychiatric review technique form, completed May 13, 2003, concluded,

10  "overall I would say that she has no mental or physical impairment that would continue to qualify

11  her for disability benefits."  This conclusion was made by Dr. Mateus after review of a fraud

12  report in which it was disclosed that plaintiff had a driver's license and admitted driving where

13  she and her daughter had earlier stated that she did not drive but got around by getting a ride or

14  using public transportation.  She was attending classes at Delta College, drove herself there, and

15  did household chores and cooked.  She conceded that she had no physical problems, contrary to

16  her application.[8]  (Id. at 218.)

17         Dr. Richwerger evaluated plaintiff on February 3, 2009.  He performed the

18  following tests: Bender-Gestalt, complete psychological evaluation, Trails A and Trails B,

19  Wechsler Adult Intelligence Scale, III, and Wechsler Memory Scale, III.  (Id. at 192.)  He

20  diagnosed malingering for Axis I, and "posttraumatic stress disorder, by history given only."

21  There was no diagnosis for Axis II.  Axis IV and V (GAF) were unclear.  (Id. at 197.)  Dr.

22  Richwerger noted that during the exam, plaintiff started to speak in a childlike fashion.  She

23  made numerous mistakes in counting backwards from 20 and in reciting the alphabet, as well as

24  other tests, causing this psychologist to opine that she was giving a suboptimal level of effort on

25

26         [8]  This report is discussed in more detail in the last section infra.

8

1   all of the tests.  He found the results of almost all tests to be invalid.  (Id. at 195-96.)  Dr.

2   Richwerger concluded that plaintiff's prognosis was unclear due to her suboptimal effort, and

3   that no valid adaptation section could be stated for this reason also.  (Id. at 197.)

4          Mr. Allen, a licensed clinical social worker, evaluated plaintiff on March 27,

5   2004.  He diagnosed post traumatic stress disorder, chronic, bereavement, depressive disorder,

6   NOS, factitious disorder with predominantly psychological signs and symptoms, rule out

7   malingering, somatic pain, and assigned a GAF of 55.[9]  (Id. at 271.)  This source would have

8   diagnosed malingering but thought that based on plaintiff's having been informed of the fraud

9   investigations, and the evaluations of three psychologists, that she had a "negative incentive for

10  malingering."  He gave this opinion despite having knowledge that plaintiff had been

11  discontinued from disability and that she was in the process of reapplying.  (Id. at 272.)  He

12  concluded that based on the interview, plaintiff would probably not be able to "enforce emotional

13  control while at work."  He also relied on her narration of being unable to perform her duties

14  after her car accident and hiding in a closet, to find that this fear along with her lack of ability to

15  remember and perform simple verbal instructions would be detrimental to her employment.  (Id.

16  at 273.)

17         Based on these opinions, the ALJ was required to use his informed judgment to

18  determine plaintiff's RFC to be medium unskilled work as malingering prevented an accurate

19  estimation of her true mental abilities.[10]

20  _____

21      [9]  GAF is a scale reflecting the "psychological, social, and occupational functioning on a
    hypothetical continuum of mental health-illness." Diagnostic and Statistical Manual of Mental
22  Disorders 32 (4th ed.1994) ("DSM IV").  According to the DSM IV, a GAF of 51-60 indicates
    moderate symptoms such as flat affect, circumstantial speech, occasional panic attacks, or
23  moderate difficulty in functioning as in few friends or conflicts with peers or co-workers.

24      [10]  Plaintiff raises for the first time in her reply brief the issue of whether the ALJ's
    hypothetical to the vocational expert failed to include all her limitations.  Reply at 3.  Issues
25  raised for the first time in a reply brief will not be considered.  Socop-Gonzalez v. I.N.S., 272
    F.3d 1176, 1185 (9th Cir. 2001).  The Commissioner has had no opportunity to respond to this
26  contention.

1    Turning to the issue of the ALJ's rejection of various examining practitioners, the

2  ALJ is not required to discuss every piece of evidence; however, the record does need to

3  demonstrate that he considered all of the evidence, and in this case it does.[11]  Clifton v. Chater,

4  79 F.3d 1007, 1009-10 (10th Cir. 1996) (finding ALJ's summary conclusion that appellant's

5  impairments did not meet or equal any Listed Impairment was a bare conclusion beyond

6  meaningful judicial review).

7    Plaintiff claims that the only practitioner for whom the ALJ explained the weight

8  given was Dr. Kalman, but plaintiff claims it was inadequate.  In this regard, the ALJ explained

9  that plaintiff's own treating physician, Dr. Young, did not think it necessary to see her for a

10  follow up visit until 24 weeks later.  (Id. at 29.)  He stated that if Dr. Young had made the same

11  (severe) findings as Dr. Kalman, he would not have waited 24 weeks for a follow up visit.  (Id.)

12  In other words, the ALJ rejected Dr. Kalman in part because his findings were inconsistent with

13  those of plaintiff's treating psychiatrist, who thought it necessary to see plaintiff only every 16 to

14  24 weeks,[12] and therefore presumably thought plaintiff's condition was not that severe.  (Tr. at

15  280, 342.)  Further, the ALJ criticized Dr. Kalman for not addressing plaintiff's malingering,

16  especially since every other examining medical professional raised it as an issue.  (Id.)

17    This consulting psychologist thought that plaintiff was a fair historian.  (Id. at

18  346.)  He noted that she does not "maintain her transportation" but that her children do all of this

19  as well as shop, cook, pay bills and do her housekeeping for her.  (Id. at 348.)  Although Dr.

20  Kalman apparently believed everything plaintiff told him, this narration by plaintiff has been

21  discredited by other sources, such as plaintiff's own children.  For example, plaintiff's son

22  

23    [11]  Plaintiff also raises for the first time in her reply a claim that the ALJ gave greater
24  weight to the assessment of the state agency physicians than to Dr. McIntire's assessment.  This
   contention will not be addressed.  Socop-Gonzalez, 272 F.3d at 1185.

25    [12]  Plaintiff points to the record which at times indicated that Dr. Young wanted to see
   plaintiff every eight weeks; however, this amount of time between visits also indicates that
26  plaintiff's condition could not have been as severe as plaintiff alleges.  (Id. at 343, 344.)

1    reported that plaintiff attended college and drove herself there.  (Id. at 182-83.)  Dr. Kalman

2    diagnosed schizophrenia, rule out PTSD, rule out schizoaffective disorder, and assigned a GAF

3    of 50.  (Id. at 349.)  Dr. Kalman found several moderate limitations in plaintiff's functioning, and

4    thought that she would likely miss work more than three or four times per month.  (Id. at 351-

5    53.)

6            This evaluation is based for the most part on plaintiff's subjective complaints.

7    "An ALJ may reject a treating physician's opinion if it is based 'to a large extent' on a claimant's

8    self-reports that have been properly discounted as incredible."  Tommasetti v. Astrue, 533 F.3d

9    1035, 1041 (9th Cir. 2008), citing Morgan v. Comm'r Soc. Sec. Admin., 169 F.3d 595, 602 (9th

10   Cir. 1999) (citing Fair V. Bowen, 885 F.2d 597, 605 (9th Cir. 1989)).  Furthermore, "the ALJ is

11   the final arbiter with respect to resolving ambiguities in the medical evidence."  Id.  This source's

12   opinion is so inconsistent with the other sources that the ALJ was correct in rejecting it.

13           Plaintiff also claims that the ALJ did not assign weight to plaintiff's treating

14   physician, Dr. Young.  Contrary to plaintiff's assumption that the ALJ gave little weight to this

15   physician based on his RFC assessment, defendant correctly points out that Dr. Young did not

16   conduct an RFC assessment and his treating records did not provide any functional limitations.

17   Therefore, despite his diagnoses of psychosis and PTSD, his failure to assess functional

18   limitations left the ALJ with no choice but to rely on other opinions which did assess plaintiff's

19   residual functional capacity based on her mental state.

20           Moreover, as just discussed, the ALJ impliedly credited this doctor when he

21   rejected Dr. Kalman.  (Id. at 29.)  The ALJ relied on Dr. Young's notes that plaintiff did not need

22   to be seen more often than every 16 to 24 weeks.  Furthermore, Dr. Young noted that plaintiff's

23   condition worsened after she lost her SSI payments, and the ALJ stated, "[t]he stress of losing

24   disability payments is not an impairment that justifies those payments."  (Id. at 29, 280.)

25           Historically, the courts have recognized conflicting medical
             evidence, the absence of regular medical treatment during the
26           alleged period of disability, and the lack of medical support for a

                                              11

1
2
3
4

> doctor's report based substantially on a claimant's subjective complaints as specific, legitimate reasons for disregarding the treating physician's opinion. <u>Flaten</u>, 44 F.3d at 1463-64; <u>Fair v. Bowen</u>, 885 F.2d 597, 604 (9th Cir.1989). The ALJ is not required to accept the opinion of a treating or examining physician if that opinion is brief, conclusory and inadequately supported by clinical findings. <u>Thomas v. Barnhart</u>, 278 F.3d 947, 957 (9th Cir.2002).

5 <u>Morehead v. Astrue</u>, 2008 WL 3891464, *5 (E.D. Wash. 2008).

6       Furthermore, it is well established that retrospective opinions are even less

7 persuasive in the specialty of mental health.  "The opinion of a psychiatrist who examines the

8 claimant after the expiration of his disability insured status, however, is entitled to less weight

9 than the opinion of a psychiatrist who completed a contemporaneous exam." <u>Macri v. Chater</u>, 93

10 F.3d 540, 545 (9th Cir. 1996); <u>Vincent v. Heckler</u>, 739 F.2d 1393, 1395 (9th Cir. 1984)

11 ("After-the-fact psychiatric diagnoses are notoriously unreliable"); <u>Weetman v. Sullivan</u>, 877

12 F.2d 20, 23 (9th Cir.1989) (new medical report following adverse administrative decision

13 denying benefits carries little, if any, weight) (citing <u>Key v. Heckler</u>, 754 F.2d 1545, 1550 (9th

14 Cir.1985)).

15       It is true that Dr. Young noted GAF scores of 45 on March 10, 2004 and July 26,

16 2005; however, it was permissible for the ALJ to rely upon only selected portions of a medical

17 opinion while rejecting other parts.  <u>See</u>, e.g., <u>Magallanes v. Bowen</u>, 881 F.2d 747, 753 (9th Cir.

18 1989) (ALJ's supported reliance on selected portions of conflicting opinion constitutes

19 substantial evidence).  However, such selective reliance must be consistent with the medical

20 record as a whole.  <u>See</u>, e.g., <u>Edlund v. Massanari</u>, 253 F.3d 1152, 1159 (9th Cir. 2001) (ALJ

21 cannot reject portion of medical report that is clearly reliable).  Based on plaintiff's malingering,

22 the ALJ reasonably could have relied on the higher GAF scores found by other examining

23 sources.  The Ninth Circuit has not prescribed a duty for the ALJ to address GAF scores.  The

24 court does not disagree with the basic premise that a low GAF score does not alone determine

25 disability, but is a piece of evidence to be considered with the rest of the record.  <u>Olds v. Astrue</u>,

26 2008 WL 339757, at *4 (D. Kan. 2008) (citation omitted).  Yet, the GAF scale does not have a

1    direct correlation to the severity requirements in the listings of mental disorders.  65 Fed. Reg.

2    50746, 50764-65 (2000).  Since plaintiff was malingering during most of the times her GAF

3    scores were assigned, it is impossible to determine what her GAF score would be if she were not

4    malingering.

5           Plaintiff cites Morales v. Apfel, 225 F.3d 310-317-18 (3rd Cir. 2000), in support of

6    her position that the ALJ may not reject a treating source just because he did not believe plaintiff

7    at the hearing and because other physicians had noted that plaintiff appeared to be malingering.

8    Here, Dr. Young himself wondered if plaintiff was malingering and his aforementioned

9    statement of noting that plaintiff's condition worsened after she lost her SSI payments, shows

10   that this case is distinguishable from Morales in that plaintiff's own treating doctor himself

11   questioned her veracity.

12          Because the ALJ did not reject Dr. Young's opinion but did consider it, he was

13   not required to set forth reasons for accepting this treating doctor.  See Clifton v. Chater, 79 F.3d

14   at 1009-10.  The same analysis holds true for Dr. Richwerger's opinion.  The ALJ did consider it,

15   and was not required to provide explanation since he did not reject it.  This psychologist assessed

16   no functional limitations based on plaintiff's suboptimal level of effort.  (Id. at 197.)

17          Plaintiff also claims that the ALJ should have developed the record further

18   because two sources, dated June 4, 2004 and July 26, 2004, opined that plaintiff needed further

19   medical work-up.  (Tr. at 276, 307.)  In response to the recommendation for such work-up by Dr.

20   Carfagni, plaintiff was seen by Dr. Sutter.  The only medical record before him was Dr.

21   Richwerger's report.  Dr. Sutter completed a full evaluation, and the lack of other medical

22   records at his disposal is not fatal.  Dr. Sutter recommended further work-up for mood disorder,

23   and plaintiff's case was evaluated by the DDS after this time, (tr. at 308-324), as well as by Dr.

24   Kalman, not to mention the multitude of mental health evaluations done prior to July, 2004.  This

25   court finds that the ALJ sufficiently developed the record.

26   \\\\\

1        Plaintiff next asserts that the ALJ erred in accepting the reports of Dr. Sutter and

2   Mr. Allen for their opinions on malingering, but then failing to accept their recommended

3   limitations.  As described earlier, Dr. Sutter found plaintiff to have only a mild impairment in

4   performing detailed and complex tasks, but a moderate impairment in maintaining regular

5   attendance due to post traumatic stress disorder.  The ALJ chose to rely on the first mild

6   impairment in finding that plaintiff could do unskilled work.  He was not required to rely on all

7   of Dr. Sutter's findings.  The ALJ may rely upon only selected portions of a medical opinion

8   while rejecting other parts.  See, e.g., Magallanes v. Bowen, 881 F.2d 747, 753 (9th Cir. 1989)

9   (ALJ's supported reliance on selected portions of conflicting opinion constitutes substantial

10  evidence).  The ALJ in this case had more than sufficient reason not to rely on portions of Dr.

11  Sutter's report as Dr. Sutter himself found that malingering complicated the case.  Based on this

12  finding, it was impossible to know what, if any, portion of that report was based on fact.  The

13  same analysis is true for Mr. Allen's opinion, which also attempted to rule out malingering.

14  Although this licensed clinical social worker[13] found that plaintiff would probably experience

15  difficulty in responding to supervisors and co-workers, it is not known whether plaintiff would

16  have the same difficulty if she were not malingering.

17       Plaintiff finally claims that the ALJ ignored plaintiff's history of erratic and

18  violent behavior which substantiates her diagnoses by long time treating physicians.  Plaintiff

19  ignores the fact that much of this history of erratic behavior has been reported by plaintiff, who

20  has specifically been found to be malingering by most sources who examined her personally.  For

21  example, plaintiff points to having gone to jail for knifing her husband after he hit her, as well as

22

23       [13]  The regulations differentiate between opinions from "acceptable medical sources" and
    "other sources."  See 20 C.F.R. §§ 404.1513 (a),(e); 416.913 (a), (e).  For example, licensed
24  psychologists are considered "acceptable medical sources," and social workers are considered
    "other sources."  Id.  Medical opinions from "acceptable medical sources," have the same status
25  when assessing weight.  See 20 C.F.R. §§ 404.1527 (a)(2), (d); 416.927 (a)(2), (d).  No specific
    regulations exist  for weighing opinions from "other sources."  Opinions from "other sources"
26  accordingly are given less weight than opinions from "acceptable medical sources."

1   four other instances of being incarcerated for assault.  The transcript citation to support these

2   instances is plaintiff's psychiatric history as told by plaintiff to Dr. Young.  (Id. at 287.)  There is

3   no independent verification of these alleged facts.  The story of plaintiff taking a knife to a

4   friend's house to assault her, and then biting the friend after being restrained, is based on

5   plaintiff's subjective report to sources at San Joaquin County Mental Health.  (Id. at 298, 286.)

6   Plaintiff also reported throwing cold grease at her son in anger, and slapping a friend.  (Id. at 282,

7   237.)  Plaintiff has not provided independent verification of these claims.  Because substantial

8   evidence supports the finding of malingering, the ALJ was not required to accept plaintiff's

9   subjective complaints.

10          That court finds that the ALJ's properly weighed all the evidence of record and

11  used the proper standards.

12          B.  Vocational Expert's Testimony About Numbers of Jobs Available to Plaintiff

13          Plaintiff claims that the vocational expert in this case relied on a private company

14  to determine numbers of jobs available for a given DOT classification, rather than independent

15  empirical data.  The ALJ then relied on this data, and refused to permit the VE to respond to

16  plaintiff's counsel's question about methodologies of extrapolating data.  When questioned by

17  the attorney, the expert testified that any independent empirical data she could gather would not

18  be better than the data accumulated by the Census Bureau.  (Tr. at 514.)  The VE had previously

19  testified that based on the ALJ's hypothetical, there were 10,000 jobs of driver helper in

20  California and 120,000 such jobs nationally, 17,000 jobs of auto detailer in California and 44,000

21  nationally, 57,000 jobs of sewing machine operator in California and 532,000 nationally, and

22  68,000 jobs of small parts assembler in California, and 700,000 such jobs nationally.  (Id. at 508-

23  09.)

24          No additional foundation for the vocational expert's information is required as the

25  consultant's "recognized expertise provides the necessary foundation for his or her testimony."

26  Bayliss v. Barnhart, 427 F.3d 1211, 1218 (9th Cir. 2005).  In this case, plaintiff did not challenge

15

1   the expert's qualifications.  (Id. at 507-08.)

2            Additionally, the expert testified that the job classifications were consistent with

3   those in the Dictionary of Occupational Titles.  (Id. at 509.)  In regard to numbers, the expert

4   testified that she relied on census data generated by the Department of Labor, as gathered by a

5   company named United Statistics.  (Id. at 514.)  Plaintiff attacks the expert's numbers because

6   they rely on this private company without any independent empirical data.  In this circuit, an ALJ

7   is not prohibited from relying on such testimony from a vocational expert.  See Johnson v.

8   Shalala, 60 F.3d 1428 (9th Cir. 1995) (no error for an ALJ to rely on expert testimony that

9   deviated from the Dictionary of Occupational Titles).  See also Powers v. Apfel, 207 F.3d 431,

10  436 (7th Cir. 2000) (finding ALJ may rely on vocational testimony even where it contradicts the

11  DOT).  In this case, the ALJ did not err in relying on the expert's testimony.

12           The court has reviewed the hearing transcript of the cross-examination of the

13  expert by plaintiff's counsel, and finds that the expert's reliance on this data is not problematic.

14  (Id. at 514-15.)  Furthermore, despite the fact that the ALJ stated, "Ms. Cerney, you jumped the

15  fence of relevance about half a mile ago," in regard to this line of questioning, the ALJ permitted

16  her to submit further points on this issue for his consideration.  (Id. at 515-16.)

17           C.  Jobs in Significant Numbers

18           Plaintiff claims that the vocational expert did not testify as to numbers of local

19  jobs in Northern California, and therefore the requirement of significant numbers of jobs has not

20  been met.

21           A claimant is not disabled if, considering her age, education, and work

22  experience, she can engage in any other kind of substantial gainful work which exists in

23  significant numbers in the national economy, regardless of whether such work exists in the

24  immediate area in which she lives.  See Barker v. Secretary of Health and Human Serv., 882 F.2d

25  1474, 1478 (9th Cir.1989) (citing 42 U.S.C. §  423(d)(2)(A) (1982 & Supp.1987)).  Further,

26  "[w]hether there are a significant number of jobs a claimant is able to perform with her

16

1   limitations is a question of fact to be determined by a judicial officer." Martinez v. Heckler, 807

2   F.2d 771, 775 (9th Cir.1986).  Moreover, the issue is whether there are jobs that a claimant could

3   perform, not whether there are any openings at such positions.  20 C.F.R. §§ 404.1566(a),

4   416.966(a); Torske v. Richardson, 484 F.2d 59, 60 (9th Cir.1973) ("the relevant inquiry is not

5   whether the claimant is able to obtain employment at some substantial activity that exists in the

6   national economy but whether the claimant is able to engage in such activity").  The Ninth

7   Circuit has not determined what number of jobs meet the "significant number" requirement.

8   Barker, 882 F.2d at 1478-79 (finding that the regulations discuss numbers of jobs, not

9   percentage).  Significant numbers must be more than two isolated jobs, but are not determined by

10  a ratio to population in the area.  Martinez, 807 F.2d at 775; Barker, 882 F.2d at 1478-79.

11          Because the vocational expert identified 152,000 jobs available to plaintiff in

12  California, and 1,396,000 jobs nationally, substantial evidence supports the ALJ's finding that

13  plaintiff is not disabled.  See Moncada v. Chater, 60 F.3d 521, 524 (9th Cir. 1995) (2,300 jobs in

14  the county and 64,000 nationwide are sufficient); Barker v. Secretary HHS, 882 F.2d 1474,

15  1478-79 (9th Cir. 1989) (1,200 jobs in Southern California are sufficient).

16          As pointed out by defendant, the ALJ is not required to obtain testimony of

17  significant numbers of jobs in plaintiff's local area.  20 C.F.R. §§ 404.1566(a)(1), 416.966(a)(1)

18  (2008) (it does not matter whether work exists in immediate area where plaintiff lives).

19          Therefore, substantial evidence supported the ALJ's finding that a significant

20  number of jobs existed in the national economy.

21          D.  Plaintiff's Request for a Supplemental Hearing in Regard to Exhibit 23F

22          Plaintiff contends that the ALJ erred in failing to grant plaintiff's request for a

23  supplemental hearing so that she could cross-examine the author of Exhibit 23F.[14]

24  \\\\\

25  ――――――――――――

26          [14]  This exhibit has been submitted as Plaintiff's Ex. A.

1    On March 24, 2006, the ALJ wrote a letter to plaintiff's counsel, advising her that

2 he was proposing to enter additional evidence into the record in the form of the Report of

3 Investigation of the Cooperative Disability Investigations Unit.  Pl.'s Ex. A at 2.  He informed

4 plaintiff's counsel that she could submit written questions to be sent to the author of the report

5 and request a supplemental hearing, and if she requested such hearing, he would "grant the

6 request unless [he] receive[d] additional records that support a fully favorable decision."

7    Plaintiff's counsel timely requested a supplemental hearing.  (Id. at 1.)  In his

8 April 26, 2006 decision, the ALJ stated that although plaintiff had requested a supplemental

9 hearing to cross-examine the authors of the investigative report, he decided not to admit this

10 exhibit into evidence.  (Id. at 20.)  Plaintiff did not raise this issue before the Appeals Council.

11 (Id. at 462-73.)

12    The problem with plaintiff's argument is that much of this same report  was

13 already entered into the original transcript of record as Exhibit 5F.  (Tr. at 176-202.)  The only

14 portion of plaintiff's Exhibit A which was not already in the record are three interoffice emails

15 between personnel at Cooperative Disability Investigations, all of which were not considered by

16 the ALJ in his decision.  (Pl.'s Ex. A at 29-31.)  Portions of the bulk of Exhibit 5F were

17 considered by the ALJ and cited heavily in his decision.

18    Without citing authority, plaintiff claims that the ALJ violated "plaintiff's

19 procedural rights by failing to grant a favorable decision and failing to grant a supplemental

20 hearing."  The ALJ does not explain why he decided not to hold a supplemental hearing or why

21 he decided not to admit the investigative report into the record; however, that he failed to hold

22 such a hearing where the evidence which was the subject of the hearing was already admitted

23 into the record does not provide a basis to set aside this decision which is independently based on

24 substantial evidence.  Brooks v. Barnhart, 66 Fed.Appx. 728, 729 (9th Cir.2003) (holding that the

25 ALJ's suggestion that a supplemental hearing would be prudent but failure to actually hold the

26 supplemental hearing was not error because substantial evidence in the record supported the

1  ALJ's determination).  Due process is only violated where the evidence is admitted without an

2  opportunity to cross-examine authors of the evidence.  See Demenech v. Sec'y of the Dep't of

3  Health & Human Servs., 913 F.2d 882, 884-85 (11th Cir.1990).  See also Passmore v. Astrue,

4  533 F.3d 658, 663-64 (8th Cir.2008) ("[s]ocial security disability hearings are non-adversarial

5  proceedings and do not require full courtroom procedures." ) (citation omitted).  Here, plaintiff

6  had the opportunity to receive the same process that was due her in regard to all of the transcript

7  of record evidence as this report was *already* part of the record.  Plaintiff also had the opportunity

8  to be heard at her administrative hearing in regard to this evidence.

9           The ALJ did rely on portions of this exhibit, including the actual investigator's

10  report.  (Tr. at 27, 28, referring to Exhibit 5F).  This exhibit includes Dr. Richwerger's report,

11  which prompted the investigation based on his diagnosis of malingering, (tr. at 24, 192-97), and

12  was correctly a part of the original record, despite its use in the investigation and its presence as

13  an attachment to the investigative report.  The ALJ additionally referred to the third party daily

14  activities questionnaire of plaintiff's daughter, dated January 7, 2003, which would have been

15  properly part of any transcript of record.  The only other reference by the ALJ to the actual report

16  itself was his mention of the interview of plaintiff's son by investigators wherein the son reported

17  that plaintiff attended college and drove to her classes.  (Tr. at 182-83.)  This interview is the

18  only portion of the actual investigative report that ordinarily would not have been part of the

19  original record, but for its inclusion in Exhibit 5F.  Even if all these pieces of evidence are

20  removed from the ALJ's analysis, however, substantial evidence remains to support his decision.

21  The question of plaintiff's malingering was independently raised by five practitioners aside from

22  Dr. Richwerger.  Therefore, any conceivable error in denying plaintiff a supplemental hearing

23  was harmless.  An error which has no effect on the ultimate decision is harmless.  Curry v.

24  Sullivan, 925 F.2d 1127, 1121 (9th Cir. 1990).

25  \\\\\

26  \\\\\

19

1   CONCLUSION

2           Accordingly, IT IS RECOMMENDED that Plaintiff's Motion for Summary

3   Judgment be denied, the Commissioner's Cross-Motion for Summary Judgment be granted, and

4   the Clerk be directed to enter Judgment for the Commissioner.

5           These findings and recommendations are submitted to the United States District

6   Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within ten

7   (10) days after being served with these findings and recommendations, any party may file written

8   objections with the court and serve a copy on all parties.  Such a document should be captioned

9   "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

10  shall be served and filed within ten (10) days after service of the objections.  The parties are

11  advised that failure to file objections within the specified time may waive the right to appeal the

12  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

13  DATED: 07/30/09

14                                              /s/ Gregory G. Hollows

15                                              GREGORY G. HOLLOWS
                                                U.S. MAGISTRATE JUDGE
16  GGH/076
    Fakoury2630.ss.wpd
17

18

19

20

21

22

23

24

25

26